IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
MOBILE DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| DONALD W. SOUTULLO, ) | CHAPTER 13 |
| ) | |
| Debtor. ) | CASE NO.: 09-11543-MAM-13 |
| ) | |
| ) | |
| DONALD W. SOUTULLO, and ) | |
| TAMMY SOUTULLO ) | |
| ) | |
| Plaintiffs, ) | ADVERSARY PROCEEDING NO. |
| ) | |
| v. ) | 09-01137 |
| ) | |
| CITIMORTGAGE, INC., ) | |
| ) | |
| Defendant. ) | |

## CITIMORTGAGE, INC.'S MOTION FOR SUMMARY JUDGMENT

**COMES NOW** defendant CitiMortgage, Inc. ("CitiMortgage"), by and through its undersigned counsel, and hereby moves this honorable Court to enter an Order for summary judgment against Plaintiffs Donald W. Soutullo ("D. Soutullo") and Tammy S. Soutullo ("T. Soutullo") (collectively referred to as "Plaintiffs" or "Soutullos") on the grounds that there is no genuine issue of material fact with respect to Plaintiffs' claims against CitiMortgage and CitiMortgage is entitled to judgment as a matter of law. This motion is based on the pleadings, affidavits, documentary evidence and the memorandum brief in support of this motion filed contemporaneously herewith. In support of this motion, CitiMortgage states as follows:

# I. SUGGESTED DETERMINATIONS OF LAW

1. Defendant is entitled to judgment as a matter of law because there is no genuine issue as to any material fact.

2. Plaintiffs' claims fail as a matter of law because CitiMortgage had a right to foreclose on Plaintiffs' property due to Plaintiffs' failure to maintain insurance coverage and provide evidence of insurance coverage and payment of taxes to ABN AMRO Mortgage Group, Inc. ("ABN AMRO") and CitiMortgage. As ABN AMRO and CitiMortgage accrued expenses in providing insurance coverage during Plaintiffs' lapses -- and Plaintiffs consistently failed to provide evidence that they had paid insurance and taxes -- CitiMortgage had a right to institute foreclosure proceedings.

3. Plaintiffs' claims for negligence and breach of fiduciary duty fail because they are barred by Alabama's two-year statute of limitations codified at Ala. Code § 6-2-38(*l*).

4. Plaintiffs' claim for wrongful foreclosure fails as a matter of law because the undisputed evidence demonstrates that CitiMortgage never exercised the power of sale given under the Mortgage.

5. Summary judgment is appropriate for Plaintiffs' claim for breach of contract because the evidence clearly demonstrates that Plaintiffs breached the loan origination agreements themselves and, as such, cannot assert their own claim for breach of the loan agreements.

6. Plaintiffs' claim for wantonness fails as a matter of law because Plaintiffs have failed to submit any evidence regarding intent on behalf of CitiMortgage, or a representative of CitiMortgage, to injure Plaintiffs.

7. Summary judgment is appropriate for Plaintiffs' claim for breach of fiduciary duty because CitiMortgage was merely Plaintiffs' mortgage lender and did not owe a fiduciary duty to Plaintiffs.

8. Plaintiffs' negligence claim fails as a matter of law because CitiMortgage has submitted uncontroverted evidence demonstrating that CitiMortgage had a right to enforce its security interest in the mortgage due to Plaintiffs' failure to obtain insurance coverage and provide evidence of insurance coverage and payment of taxes and, therefore, Plaintiffs cannot demonstrate that any alleged negligence on the part of CitiMortgage caused their damages. Moreover, Plaintiffs' own contributory negligence bars their recovery.

## II. SUGGESTED DETERMINATIONS OF UNDISPUTED FACT

### A. Plaintiffs' Backgrounds.

9. T. Soutullo is forty seven years old and is the wife of D. Soutullo. (*See* Exhibit A, Deposition of Tammy Soutullo, p. 8-9). T. Soutullo painted and hung wallpaper for several years, but retired approximately nine years ago. (*Id.*, p. 17.)

10. D. Soutullo is fifty-one years old and owns a business called "Soutullo Drywall." (*See* Exhibit B, Deposition of Donald W. Soutullo, p. 8.) D. Soutullo has always found employment hanging drywall and started Soutullo Drywall approximately fifteen years ago. (*Id.*, p. 11.)

11. T. Soutullo attended Baker High School in Mobile, Alabama, but quit school in 1980, when she was in the tenth grade. (Ex A, p. 15-16.) D. Soutullo also attended high school and failed to finish the tenth grade. (Ex. B, p. 10.)

12. Plaintiffs have two children, one lives in the house with Plaintiffs and the other lives on the same piece of property. (Ex. A, p. 9.)

13. T. Soutullo handles the couples' financial affairs and has the most knowledge regarding their mortgage loan. (Ex. B, p. 11.)

14. For the past five years, Plaintiffs have lived in a house located at 167 Howell Tanner Chapel Road, Lucedale, Mississippi, 39452 (the "Howell Tanner Chapel Road Property"). (Ex. A, p. 9.)

15. Prior to moving to the Howell Chapel Road Property, Plaintiffs lived at 11085 A Catherine Creek Drive, Mobile, Alabama, 36695 (the "Property"). (Ex. A, p. 10; Ex. 1 to Ex. A, November 21, 2002 Note ("Note").) Plaintiffs still own the Property. (Ex. A, p. 10-11.) This is the Property at issue in this case. (*See, e.g.*, Doc. 1, Adversary Complaint.)

16. D. Soutullo and his family have owned the Property since D. Soutullo was born. (*Id.*, p. 11.) Plaintiffs lived on the property for twenty-two years. (*Id.*)

17. Currently, Jerry Soutullo ("J. Soutullo"), D. Soutullo's brother, resides at the Property. (*Id.*, p. 12.) J. Soutullo makes rent payments to Plaintiffs in order to live at the Property. (*Id.*).

### B. Plaintiffs' Loan With ABN AMRO and CitiMortgage.

#### 1. Loan Origination.

18. When Plaintiffs first began living at the Property, they lived in a mobile home at the Property and paid for the mobile home with a "personal loan." (*Id.*, p. 18.)

19. After approximately five years of living in the mobile home, Plaintiffs had a house moved in from Agricola, Mississippi. (*Id.*) Plaintiffs then combined their personal loan with a loan from AmSouth Bank to pay for the house. (*Id.*)

20. On or about November 21, 2002, Plaintiffs obtained a loan from ABN AMRO, in the amount of $54,400.00 in order to complete some remodeling on the Property (the "Loan"). (*Id.*; Ex. 1 to Ex. A.) D. Soutullo obtained the Note without the signature of T. Soutullo. (Ex. A,

p. 21.) However, Plaintiffs jointly made the decision to obtain the Loan. (*Id.*, p. 30.) Plaintiffs obtained the Loan because it had a better interest rate than their previous loan on the Property. (*Id.*, p. 19.)

21. Plaintiffs obtained the Loan from ABN AMRO. (*Id.*, p. 19.) In order to obtain the Loan, Plaintiffs retained the services of mortgage broker Janice Johnson ("Ms. Johnson") at First Choice Mortgage on Dauphin Street in Mobile, Alabama ("First Choice"). (*Id.*)

22. The Loan is secured by a mortgage interest in the Property granted by Plaintiffs to ABN AMRO. (*Id.*, pp. 22-23; Ex. 2 & 3 to Ex. A, November 21, 2002 Mortgage ("Mortgage").) Both Plaintiffs signed the Mortgage. (Ex. A, pp. 22-23; Ex. 3 to Ex. A.)

23. After speaking with their mortgage broker, Ms. Johnson, Plaintiffs decided to pay taxes and insurance outside of escrow. (Ex. A, p. 32.) In order waive the escrow requirement contained in the Mortgage, Plaintiffs signed an "Escrow Waiver Agreement," whereby they agreed to waive the requirement that an escrow account be set up. (*Id.*, pp. 27-29; Ex. 4 to Ex. A, Escrow Waiver Agreement ("Escrow Waiver").)

24. In exchange for permitting Plaintiffs to waive the requirement of an escrow account, their Escrow Waiver provided that they were required to provide proof of insurance and taxes to their mortgage company. (*Id.*, p. 29; Ex. 4 to Ex. A.) The Escrow Waiver provided, in pertinent part:

> WHEREAS, the Security Instrument provides for monthly payments by Borrower to Lender to be held in escrow, hereinafter called "Escrow Account", to pay taxes, assessments, leasehold payments or ground rents, **hazard insurance premiums**, flood insurance premiums, and mortgage insurance premiums; and
>
> WHEREAS, Borrower has requested Lender to waive the requirement that Borrower establish or maintain an Escrow Account with Lender; and
>
> WHEREAS, Lender has agreed to waive such Escrow Account on certain terms and conditions;

NOW THEREFORE, for an in consideration of the promises and agreements herein set forth, and other good and valuable consideration and in consideration of payment of an Escrow Waiver Fee, if any, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

\*\*\*

III. For so long as the Security Instrument and the Note secured thereby remain in force and effect, **Borrower shall pay in full** () all applicable taxes referred to above by December 31st of each year in which they are assessed, and (ii) **all other applicable items referred to above prior to their respective delinquency or lapse in coverage**, as applicable. Likewise, for so long as the Security Instrument and the Note secured thereby remain in force and effect, **Borrower shall furnish satisfactory evidence to Lender of timely payment in full** of (i) all applicable taxes by January 31st of the following year, and (ii) all **other applicable items prior to their respective delinquency or lapse in coverage**, as applicable. "Satisfactory evidence," as used herein, shall mean **cancelled check, paid tax receipt or written confirmation of payment from the party to whom the obligation is owed**, as appropriate in Lender's discretion.

\*\*\*

V. In the event of a delinquency or default under this Agreement or the Note or the Security Instrument, among any other remedies available to Lender, **Lender may at Lender's option terminate this Agreement and require Borrower to establish and maintain an Escrow Account with Lender** in the manner provided for in the Security Instrument.

VI. Borrower's failure to fully comply in a timely manner with all the terms hereof **shall constitute a default** under this Agreement and the Note and the Security Instrument.

(Ex. 4 to Ex. A (emphasis added).) Plaintiffs understood that failing to comply with the terms of the Escrow Waiver could lead to a default under their Note and Mortgage. (*Id.*, pp. 29-30.)

25. The Mortgage signed by Plaintiffs stated that if Plaintiffs were in default, CitiMortgage had a right to invoke its remedies under the Mortgage, including the power of sale. (Ex. 3 to Ex. A.)

26. The Mortgage also contains a provision entitled "Property Insurance," which provides, in pertinent part:

> 5. **Property Insurance.** <u>Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss</u> by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably.

(Ex. A, pp. 24-25; Ex. 2 to Ex. A (emphasis added).)

27. In connection with obtaining the Loan, Plaintiffs received an "Insurance Authorization" form, which provided that:

> The Security Instrument . . . which secures the loan noted above requires that <u>**proper fire, hazard, flood**</u> (if applicable) and or other property insurance <u>**be carried in the amount of the loan**</u> to protect you and also the Lender . . . <u>**and authorizes us to obtain the insurance on your behalf if you fail to do so**</u>.
>
> \*\*\*
>
> The insurance policies may be provided by an agent of your choice; however, policies or evidences of insurance, in a form reasonably acceptable to us, must be in our office prior to the closing of the loan. <u>**Also, a renewal policy for each policy must be in our office at least 15 days prior to the expiration date of the previous policy. In the event any renewal policy is not in our office within the required time, we will order a renewal policy in like amount and for like coverages from an agent of our choice.**</u>

(Ex. A, p. 34; Ex. 5 to Ex. A, Insurance Authorization Form (emphasis added).)

28. Despite the language contained in the Insurance Authorization Form, Plaintiffs did not mail in the required renewal policy, but left that responsibility to their insurance company. (Ex. A, pp. 33-34.)

29. Due to their execution of the Escrow Waiver, Plaintiffs' account originally was initiated as a "non-escrow" account and they were responsible for paying their taxes and insurance. (Exhibit C, Deposition of Bryan Schrepel, pp. 49-50; Ex. 4 to Ex. C (000439)).

### 2. CitiMortgage Obtains Plaintiffs' Note.

30. In August 2007, CitiMortgage obtained Plaintiffs' Note and Mortgage from ABN AMRO. (*See* Ex. C, p. 31; Ex. 2 to Ex. C; *see also* Ex. A, pp. 44-46.) Thereafter, Plaintiffs received monthly statements from CitiMortgage. (Ex. A, p. 48; Ex. D, Affidavit of Bryan Schrepel, ¶¶ 3-6; Ex. 1 to Ex. D, CitiMortgage Statements to Plaintiffs.) CitiMortgage sent Plaintiffs statements from September 2007 to present. (Ex. 1 to Ex. D.) The monthly statements reflected that an escrow had been created in which was reflected a negative balance. (Ex. 1 to Ex. D.)

31. Again, each statement showed an "Escrow Balance" as part of the amount owed. (Ex. 1 to Ex. D.)

32. Plaintiff admits to receiving these statements, (*see* Ex. A, p. 48), yet Plaintiff never called CitiMortgage to ask about the negative escrow balance shown in the statements. (*See* Ex. A, pp. 48-51.)

### 3. Issues With Insurance Coverage.

33. Plaintiffs understood that they were required to have the Property insured. (Ex. A, p. 25.) Plaintiffs obtained their homeowners insurance through Alfa Insurance agent Tommy Lambert in Semmes, Alabama. (*Id.*, pp. 36-37.)

34. Despite their understanding of the insurance requirement, Plaintiffs allowed their property insurance policy to lapse on several occasions and an escrow account was then required by ABN AMRO and CitiMortgage (*Id.*, p. 26; Ex. C, pp. 34, 41; Ex. 5 to Ex. C.)

35. Plaintiffs allowed their insurance to lapse from January 10, 2004 through January 21, 2004, requiring ABN AMRO to obtain an insurance policy from Fidelity and Deposit Company of Maryland. (Ex. 6 to Ex. A.)

36. ABN AMRO also obtained insurance for Plaintiffs from July 21, 2004 through August 11, 2004 from Fidelity and Deposit Company of Maryland due to Plaintiffs' failure to maintain insurance. (Ex. 6 to Ex. A.)

37. ABN AMRO again provided insurance coverage, this time from February 10, 2006 through May 25, 2006 from Empire Fire and Marine Insurance Company due to Plaintiffs' failure to maintain insurance on the Property. (Ex. 6 to Ex. A; Ex. C, p. 88.)

38. CitiMortgage provided insurance coverage from May 25, 2008 through July 4, 2008 from American Security Insurance Company due to Plaintiffs' failure to maintain insurance on the Property. (Ex. 6 to Ex. A; Ex. C, pp. 85-86.)

39. ABN AMRO and CitiMortgage sent numerous letters to Plaintiffs between 2004 and 2008 informing them of various insurance lapses. (Ex. 6 to Ex. A.) In regard to the numerous letters sent from CitiMortgage about insurance lapses, T. Soutullo testified that "if I did [receive them] I didn't follow through with reading them." (Ex. A, p. 53.)

40. T. Soutullo stated that she did remember an insurance lapse in November or December of 2008. (Ex. A, pp. 39-40.)

41. Both ABN AMRO and CitiMortgage made various payments to insurers to cover lapses in Plaintiffs' insurance policy. (Ex. C, pp. 158-159.) Payments to insurance agencies and refunds made to Plaintiffs' escrow account are as follows:

| Insurance Payments Made By ABN AMRO and CitiMortgage and Refunds Credited to Plaintiffs' Loan Balance ||
|---|---|
| Date | Payment / Refund Amount |
| 2/2/2004 | $19.58 |
| 11/24/2004 | $684.40 |
| 2/9/2005 | $362.60 |
| 2/17/2005 | -$645.02 |
| 4/21/2006 | $743.40 |
| 7/10/2006 | -$531.58 |
| 8/12/2008 | $634.00 |
| 2/20/2009 | -$181.11 |
| **Total Insurance Delinquency:** | **$1,086.27** |

(Ex. C, pp. 158, 168, 171, 175; Ex. 5 to Ex. C.)

### 4. Issues With Tax Charges.

42. During the origination of Plaintiffs' Loan with ABN AMRO, the wrong parcel was identified in the origination documents, causing ABN AMRO -- and subsequently CitiMortgage -- to make tax payments and charge Plaintiffs for tax payments on the wrong parcel. (Ex. C, p. 55.) Plaintiffs' Property was identified with parcel number 004054**76**, which is actually the parcel number for property previously owned by Plaintiffs and now the property of Plaintiffs' nephew. (Ex. C, p. 93; Ex. 4 to Ex. C (000418)). The correct parcel number for Plaintiffs' Property is 004054**67**. (Ex. C, p. 93; Ex. 4 to Ex. C (000418)).

43. ABN AMRO and CitiMortgage made tax payments on Plaintiffs' nephew's property as follows:

| Tax Payments Made By ABN AMRO and CitiMortgage ||
|---|---|
| Date | Payment Amount |
| 4/27/2006 | $240.00 |
| 5/30/2006 | -$240.00 |
| 4/24/2007 | $535.98 |
| 10/15/2007 | $562.68 |
| 10/24/2008 | $583.05 |
| 10/26/2009 | $583.05 |

(Ex. E, Discovery Responses of CitiMortgage; Ex. C, pp. 68-69, 71-72; Ex. 5 to Ex. C.)

44. The amounts paid for taxes by ABN AMRO and CitiMortgage were charged to Plaintiffs' loan through an escrow account that was created after origination. (Ex. C, pp. 73-74.)

45. On May 30, 2006, ABN AMRO issued a refund to Plaintiffs' escrow account for the tax refund it received on the same day in the amount of $240.00. (Ex. C, p. 84; Ex. 5 to Ex. C.)

46. As early as 2004, Plaintiffs had a discussion with ABN AMRO whereby T. Soutullo informed ABN AMRO that it had not paid her land taxes. (Ex. A, p. 43.)

47. A representative of ABN AMRO had another conversation with T. Soutullo on May 23, 2006, during which Ms. Soutullo informed the representative that ABN AMRO had paid taxes on the wrong property. (Ex. C, pp. 76-77; Ex. 4 to Ex. D (000419).)

48. T. Soutullo had another conversation with ABN AMRO on June 2, 2006, during which they again discussed ABN AMRO's payment of taxes on the wrong parcel. (Ex. C, pp. 95-96; Ex. 4 to Ex. C (000415-000416).)

49. On June 15, 2006, T. Soutullo had yet another conversation with ABN AMRO regarding the tax issue. (Ex. C, pp. 98-99; Ex. 4 to Ex. C (000412).)

50. In 2007, T. Soutullo again had a conversation with her lender about paying her land taxes. (Ex. A, p. 50.) She told her lender that they had paid her nephew's land taxes. (*Id.*)

51. Since discovering the error by ABN AMRO in entering the incorrect parcel number as to Plaintiffs' property, CitiMortgage has refunded several tax payments to Plaintiffs'

Loan. (Ex. C, p. 82.) CitiMortgage has refunded previously erroneous tax payments, in the following amounts:[1]

| Tax Refunds Made By CitiMortgage to Plaintiffs | |
|---|---|
| Date | Refund Amount |
| 5/19/2010 | -$583.05 |
| 5/19/2010 | -$583.05 |
| 5/19/2010 | -$562.68 |

(Ex. C, p. 82; Ex. 5 to Ex. C.)

### 5. Escrow Communications.

52. On April 24, 2006, ABN AMRO sent Plaintiffs an "Annual Escrow Account Disclosure Statement," which indicated that Plaintiffs owed $1,393.31 in escrow shortage. (Ex. 9 to Ex. A.)

53. On April 28, 2006, ABN AMRO sent Plaintiffs another "Annual Escrow Account Disclosure Statement," which indicated that Plaintiffs owed $1,697.30 in escrow shortage. (Ex. 9 to Ex. A.)

54. On April 27, 2007, ABN AMRO sent Plaintiffs an "Annual Escrow Account Disclosure Statement," which indicated that Plaintiffs owed $1,553.14 in escrow shortage. (Ex. 9 to Ex. A.)

55. On September 13, 2007, before Plaintiffs' Loan was transferred to CitiMortgage, ABN AMRO sent Plaintiffs a statement of escrow activity that showed Plaintiffs had a negative escrow balance of $1,147.39. (Ex. 9 to Ex. A.)

56. On November 16, 2007, CitiMortgage sent Plaintiffs an "Escrow Account Disclosure Statement," which indicated that Plaintiffs owed $1,225.04 in escrow shortage. (Ex. 12 to Ex. A.)

---

[1] CitiMortgage also notes that it is currently working on refunding the remaining erroneous tax payments that were made by ABN AMRO prior to CitiMortgage obtaining Plaintiffs' Loan.

57. On November 14, 2008, CitiMortgage sent Plaintiffs an "Escrow Account Disclosure Statement," which indicated that Plaintiffs owed $846.25 in escrow shortage. (Ex. 12 to Ex. A.)

58. On April 14, 2009, CitiMortgage sent Plaintiffs an "Escrow Account Disclosure Statement," which indicated that Plaintiffs owed $245.04 in escrow shortage. (Ex. 12 to Ex. A.)

  **6. Foreclosure Activities.**

59. On December 30, 2008, CitiMortgage sent Plaintiffs a letter stating that they had received Plaintiffs' check for $452.00, but were returning it because the check was insufficient to cure their delinquency. (Ex. A, pp. 70-71; Ex. 10 to Ex. A.)

60. On January 27, 2009, Colleen McCullough with the law firm of Sirote & Permutt, P.C. sent Plaintiffs a letter informing them that the total amount owed to reinstate Plaintiffs' Loan was $5,968.61 and without receiving those funds, Sirote & Permutt, P.C. was moving forward with foreclosure. (Ex 15 to Ex. A.)

61. On February 19, 2009, attorney Colleen McCullough sent Plaintiffs a letter verifying that the payments sent by Plaintiffs from September 13, 2007 through October 14, 2008 were properly credited to Plaintiffs' account, but that due to an escrow shortage, CitiMortgage was foreclosing on Plaintiffs' Property. (Ex. 13 to Ex. A.)

**C. Plaintiffs' Bankruptcy.**

62. Plaintiffs filed for bankruptcy on April 3, 2009. (Doc. 1, Complaint, ¶ 16.)

63. To date, CitiMortgage has never foreclosed its lien on the Property. (Ex. A, p. 40.)

64. By the time Plaintiffs' filed their bankruptcy, CitiMortgage claimed an arrearage of $5,084.51, which included, $4,517.82 in late payments, $158.06 in accrued late charges, $84.00 for a BPO appraisal, $245.04 for an escrow shortage representing both late tax and

1842443 v1  13
Case 09-01137   Doc 18   Filed 07/12/10   Entered 07/12/10 17:02:33   Desc Main
Document      Page 13 of 15

insurance payments, $49.32 for a late fee, $0.57 in miscellaneous charges, and $30.00 for a property inspection. (Ex. C, pp. 40-41; Ex. 3 to Ex. C (000219).) The $4,517.82 represented eight payments by which Plaintiffs were delinquent. (Ex. C, p. 40.)

65. Plaintiffs filed their adversary complaint against CitiMortgage on December 11, 2009. (Ex. C, p. 83; Doc. 1.)

### III. CONCLUSION

Based on the foregoing evidence, and Defendant's memorandum of law in support filed contemporaneously herewith, Defendant respectfully requests that this Court grant Defendant's Motion for Summary Judgment.

Dated this 12th day of July, 2010.

/s/ Marc P. Solomon
Marc P. Solomon
Reid S. Manley (MAN039)
Matthew T. Mitchell (MIT050)
Zachary D. Miller (MIL135)

Attorneys for Defendant
CITIMORTGAGE, INC.

**OF COUNSEL:**
BURR & FORMAN LLP
420 North 20th St.
Suite 3400
Birmingham, Alabama 35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing document by Notice of Electronic Filing, or, if the party served does not participate in Notice of Electronic Filing, by U.S. First Class Mail, hand delivery, fax or email on this the 12th day of July, 2010:

Earl P. Underwood, Jr.
Law Offices of Earl P. Underwood, Jr.
21 South Section Street
Fairhope, Alabama 36532
Telephone: (251) 990-5558
Facsimile: (251) 990-0626
epunderwood@gmail.com

Kenneth J. Riemer
166 Government Street, Suite 100
Mobile, Alabama 36602
Telephone: (251) 432-9212
Facsimile: (251) 433-7172

/s/ Marc P. Solomon
OF COUNSEL