*Soutullo, et al. v. CitiMortgage, Inc.*; Adversary Proceeding No. 09-01137

**Exhibit A, Part 1 to CitiMortgage, Inc.'s Motion for Summary Judgment**

```
1              IN THE UNITED STATES BANKRUPTCY COURT
           FOR THE SOUTHERN DISTRICT OF ALABAMA
2                     MOBILE DIVISION


3
       * * * * * * * * * * * * * * *   *
4      IN RE:                          *
                                       *
5      DONALD W. SOUTULLO,             *CHAPTER 13
                                       *CASE NO.:
6               Debtor,                *09-11543-MAM-13
                                       *
7      * * * * * * * * * * * * * * *   *
                                       *
8      DONALD W. SOUTULLO and TAMMY    *
       SOUTULLO,                       *
9                                      *
                Plaintiffs,            *
10                                     *ADVERSARY
       vs.                             *PROCEEDING NO.:
11                                     *09-1137
       CITIMORTGAGE, INC.,             *
12                                     *
                Defendant.             *
13     * * * * * * * * * * * * * * *   *

14

15

16          The testimony of TAMMY SOUTULLO, taken at

17       the law offices of Kenneth J. Riemer, 166

18       Government Street, Suite 100, Mobile, Alabama,

19       on May 26, 2010, commencing at 9:42 a.m.

20

21

22

23

       FREEDOM COURT REPORTING, 301 ST. LOUIS STREET, MOBILE, ALABAMA
                        (251) 438-4990
```

EXHIBIT
A

Desc Exhibit

1          Q.    Is it fair that if you go ahead and answer

2    the question that you understood the question?

3          A.    Yes.

4          Q.    If you need to take a break at any time

5    just let me know and we can stop.  I'm going to have to

6    go out and feed the meter in a little while, but we'll

7    take a break at some point.  But just let me know and

8    we'll stop.

9                Tell me what your social security number

10   is.

11               MR. RIEMER:  Can she just give the last

12          four digits?  I can give you the rest of it.  I

13          just don't want it on this transcript.

14               MR. MANLEY:  Yes.

15               MR. RIEMER:  Just give the last four

16          digits.

17               THE WITNESS:  ██████

18   BY MR. MANLEY:

19         Q.    What's your date of birth?

20         A.    ████████

21         Q.    And you're married?

22         A.    Yes.

23         Q.    And your husband's name is --

```
1         A.    Donald W. Soutullo.

2         Q.    What does the W stand for?

3         A.    Wayne.

4         Q.    Have you ever been married before

5    Mr. Soutullo?

6         A.    No.

7         Q.    How long have you guys been married?

8         A.    Twenty-nine years.

9         Q.    Do you have children?

10        A.    Two.

11        Q.    How old are they?

12        A.    ████████is twenty-eight and ████████is

13   twenty-four.

14        Q.    Do they live with you guys?

15        A.    ████████does.

16        Q.    That's ████████.  Where does ████████

17   live?

18        A.    He lives on the same property with us.

19        Q.    Tell me what your current address is.

20        A.    ███████████████████Lucedale,

21   Mississippi, 39452.

22        Q.    How long have you lived at that address?

23        A.    Five years.
```

Case 09-01137    Doc 18-1    Filed 07/12/10    Entered 07/12/10 17:02:33    Desc  Exhibit
A    Part 1    Page 4 of 61

```
1          Q.    Before you moved to the Howell Tanner

2    Chapel Road address you lived at the Catherine --

3          A.    Catherine Creek.

4          Q.    -- Catherine Creek Drive, ████████████

5    ████████ address?

6          A.    Yes.

7          Q.    And you currently still own the Catherine

8    Creek Drive address?

9          A.    Yes.

10         Q.    You have a mortgage on the Howell Tanner

11   Chapel Road house?

12         A.    Yes.

13         Q.    Who's that mortgage with?

14         A.    Homecoming, GMAC Mortgage.

15         Q.    Are you current on that mortgage?

16         A.    Yes.

17         Q.    Have you ever been late making payments on

18   the Homecoming mortgage?

19         A.    No.

20         Q.    Switching gears to the ██████ Catherine

21   Creek Drive address, how long have you owned that

22   property?

23         A.    Well, he's owned the property all his
```

Case 09-01137    Doc 18-1    Filed 07/12/10    Entered 07/12/10 17:02:33    Desc  Exhibit
A    Part 1    Page 5 of 61

1    life, but we've lived on the property for twenty-seven

2    years.

3         Q.    You say 'he's owned the property all his

4    life,' your husband?

5         A.    Yes.

6         Q.    So, that was family property?

7         A.    Yes.

8         Q.    And you guys lived there for twenty-seven

9    years?

10        A.    We moved a mobile home in twenty-seven

11    years ago.  We've had the house there for, it will be

12    twenty-three in November.

13        Q.    For the last five years you haven't lived

14    there, right?

15        A.    Right.

16        Q.    But the house has been there twenty-three

17    years and you guys moved to that property twenty-seven

18    years ago, is that right?

19        A.    Yes.

20        Q.    How many acres is the Catherine Creek

21    Drive?  Maybe I shouldn't do that because I think we're

22    going to talk about another address on Catherine Creek

23    Drive.

Case 09-01137    Doc 18-1    Filed 07/12/10    Entered 07/12/10 17:02:33    Desc  Exhibit
A   Part 1    Page 6 of 61

1           How many acres is the ████████ Catherine

2   Creek Drive?

3           A.    Three.

4           Q.    Who lives there now?

5           A.    My brother-in-law.

6           Q.    What's his name?

7           A.    Jerry Soutullo.

8           Q.    Is the property still in your husband's

9   name?

10          A.    Yes.

11          Q.    Does Jerry Soutullo make any payments on

12  the mortgage?

13          A.    He pays us rent.

14          Q.    Is the mobile home still there or just the

15  house?

16          A.    Just the house.

17          Q.    Do you guys own any other property around

18  Catherine Creek Drive?

19          A.    No.

20          Q.    Did you ever own any other property other

21  than the ████████ Catherine Creek Drive property?

22          A.    Yes.

23          Q.    What property was that?

```
1          Q.    Has Homecoming had your mortgage on the

2    Lucedale property the entire five years?

3          A.    Yes.

4          Q.    Have you ever been convicted of any crime?

5          A.    No.

6          Q.    Ever been arrested before?

7          A.    No.

8          Q.    Ever been a plaintiff in a lawsuit before,

9    other than this one?

10         A.    No.

11         Q.    Have you ever been a witness in court?

12         A.    No.

13         Q.    Ever served on jury duty?

14         A.    No.

15         Q.    Other than the bankruptcy that you guys are

16   in right now -- did you file bankruptcy as well or just

17   your husband?

18         A.    Just my husband.

19         Q.    Have you ever filed bankruptcy?

20         A.    Let's see.  No.

21         Q.    Tell me, if you would, about your

22   educational background.

23         A.    I think I started in the tenth and quit.
```

Case 09-01137   Doc 18-1   Filed 07/12/10   Entered 07/12/10 17:02:33   Desc Exhibit
A   Part 1   Page 8 of 61

```
1          Q.    You started the tenth grade and then quit?

2          A.    Yes.

3          Q.    Where did you go to high school?

4          A.    Baker.

5          Q.    Where is that?

6          A.    Airport Boulevard, west Mobile.

7          Q.    Have you ever had any schooling since

8    then?

9          A.    No.

10         Q.    Any kind of vocational training?

11         A.    No.

12         Q.    Who handles you all's financial affairs?

13         A.    I do.

14         Q.    You feel like you're capable of doing

15   that?

16         A.    Yes.

17         Q.    So, what year would that have been when you

18   were in the tenth grade, do you remember?

19               MR. RIEMER:  1980.  We're the same age.

20               THE WITNESS:  I couldn't think.

21   BY MR. MANLEY:

22         Q.    1980?

23         A.    Yes.
```

1      A.    It's all family and I never knew if one of

2   my kids would want to move back, you know.

3      Q.    In your interrogatory responses I remember

4   seeing that you had a time period, maybe after the

5   hurricane came through in '05, somewhere around there

6   where you guys got delinquent on the ABM loan at the

7   time, what became the CitiMortgage loan. Have you guys

8   ever been delinquent on any other debts?

9      A.    No.

10      Q.    When you built the house on the property

11   there twenty-three years ago or whatever did you have a

12   mortgage on the house?

13      A.    I think it was a personal loan. We had the

14   house moved in from Agricola.

15      Q.    Not the mobile home, the actual house?

16      A.    Right. I think we had a little loan on

17   the mobile home, so we combined the two notes onto the

18   house.

19      Q.    Do you recall who that mortgage was with?

20      A.    In the beginning that was AmSouth Bank.

21      Q.    Okay. How did you end up getting to

22   ABM-AMRO for that loan, which looks like it happened

23   November 21st, 2002?

Case 09-01137   Doc 18-1   Filed 07/12/10   Entered 07/12/10 17:02:33   Desc Exhibit A   Part 1   Page 10 of 61

1          A.     I think we did that because of the

2    interest.  We remodeled the house.

3          Q.     You paid off the previous loan you had

4    with AmSouth and you did some work on your house?

5          A.     Correct.

6          Q.     And you mentioned maybe you got a better

7    interest rate?

8          A.     Yes.

9          Q.     Did ABM-AMRO have a branch here, how did

10   you guys get to them, do you recall?

11         A.     The loan officer was Janice, I think her

12   name was Johnson at the time.  First Choice Mortgage is

13   who we went through.  And she, I guess that's who we went

14   through.

15         Q.     Where is she located?

16         A.     I do not know where Janice is at at this

17   time.

18         Q.     Do you recall where she was when you guys

19   went to her?

20         A.     Yes.  She was on Dauphin Street.

21         Q.     So, she had an office here in Mobile?

22         A.     Yes.

23

1    BY MR. MANLEY:

2         Q.   I guess one of my questions is:  Is this

3    the note that looks like just your husband signed for

4    the ABM-AMRO loan that was secured by the ▓▓▓▓▓

5    Catherine Creek Drive property?

6              MR. RIEMER:  Is that Donnie's signature?

7              THE WITNESS:  Yeah, yes.

8    BY MR. MANLEY:

9         Q.   So, you were not a party to the note?

10        A.   No.

11        Q.   Is that correct?

12        A.   No.

13        Q.   So your husband took this loan out without

14   you on it?

15        A.   I had to sign because I was his wife, but

16   I'm not on the mortgage.

17        Q.   You're not on the note?

18        A.   No.

19        Q.   You probably signed the mortgage and we'll

20   get to that here in just a second.

21             And the date is November 21st, 2002, is

22   that right?  Do you see that in the top left corner?

23        A.   Yes.

Case 09-01137   Doc 18-1   Filed 07/12/10   Entered 07/12/10 17:02:33   Desc Exhibit
A   Part 1   Page 12 of 61

1          MR. RIEMER:  Maybe you can ask some of

2      these questions to Mr. Soutullo.

3  BY MR. MANLEY:

4      Q.   I am going to ask you about the mortgage

5  here and I probably will ask about some of these

6  documents.

7          (Whereupon, Defendant's Exhibit #2 was

8           received and marked for identification)

9  BY MR. MANLEY:

10     Q.   Let me show you what I marked as Exhibit 2.

11         MR. RIEMER:  For now he's just making sure

12     this is the mortgage on this property.

13         THE WITNESS:  Right.

14         MR. MANLEY:  And you and I can probably

15     stipulate to that, if you want.

16         MR. RIEMER:  Sure.

17         MR. MANLEY:  Exhibit 2 is the mortgage that

18     secured the note.  Exhibit 1 --

19         MR. RIEMER:  Let me make sure that it's all

20     there.  Is that your signature?

21         THE WITNESS: Yes.

22         MR. RIEMER:  Is that your signature?

23         THE WITNESS:  Yes.

```
1              MR. RIEMER:  We can do that.  Exhibit 2 is

2        the mortgage.

3   BY MR. MANLEY:

4        Q.    I heard you answer him that that is your

5   signature on the last page, or really the

6   second-to-the-last page.

7              Are those your initials at the bottom of

8   each of these pages?

9        A.    Yes.

10       Q.    Does that look like your husband's

11  initials?

12       A.    Yes.

13       Q.    Is that your husband's signature at the

14  end on the second-to-the-last page right next to yours?

15       A.    Here?

16       Q.    On the second-to-the-last page where your

17  signature is?

18       A.    Yes.

19       Q.    Let me direct you to paragraph in here,

20  actually it's on the mortgage, on Exhibit 2.  It's the

21  third page, numbered paragraph five.  This is pretty

22  small.

23             MR. RIEMER:  Hang on because I think mine
```

Case 09-01137   Doc 18-1   Filed 07/12/10   Entered 07/12/10 17:02:33   Desc  Exhibit
A   Part 1   Page 14 of 61

```
1          is easier.  I didn't write on it except this top

2          part right here.  Reid, do you want to use this

3          one?

4                MR. MANLEY:  That's probably a little

5          easier.

6                MR. RIEMER:  Make sure it's all there.

7                MR. MANLEY:  It's a little bit different

8          format.  I'll mark this as Exhibit 3.

9                (Whereupon, Defendant's Exhibit #3 was

10                received and marked for identification)

11   BY MR. MANLEY:

12          Q.   Mrs. Soutullo, let me show you what I

13   marked as Exhibit 3.  That's another copy of your

14   mortgage, maybe one that will be easier to read.

15                If you would, turn to the third page where

16   I had you looking earlier.  It's paragraph five,

17   numbered paragraph five.  It's going to be right there

18   (indicating).  It's entitled "property insurance."

19          A.   Uh-huh.

20          Q.   Can you read that paragraph or is it too

21   difficult?

22          A.   It is.  It runs together on me.  I've got

23   cataracts.
```

Case 09-01137   Doc 18-1   Filed 07/12/10   Entered 07/12/10 17:02:33   Desc Exhibit
A   Part 1   Page 15 of 61

1          Q.     Maybe I'll read it and tell you what it

2     says here and see if you agree with me.  It has five,

3     property insurance, "borrower shall keep the

4     improvements now existing or hereafter erected on the

5     property insured against loss by fire, hazards included

6     within the term of extended coverage and any other

7     hazards including, but not limited to, earthquakes and

8     floods for which lender requires insurance."

9               You might not can read that, but I'm

10    representing to you that's what it says.

11         A.     Yeah.  I was trying to follow you.

12         Q.     Were you all aware that you had to have the

13    property insured?

14         A.     Yes.

15         Q.     And I believe from your interrogatory

16    responses that you never had any lapses in your insurance

17    coverage, is that you all's position?

18         A.     Say it again.

19         Q.     Okay.  In response to some interrogatories

20    that I had sent you guys said that you had never let

21    your homeowners insurance lapse with respect to the

22    property on ▓▓▓▓▓▓▓ Catherine Creek Drive.  Is that true,

23    that it never lapsed?

1      A.   No.  I went thirty days over and when I

2  got my second notice I went and paid it and caught it up

3  just one time.

4      Q.   So, just one time that that happened?

5      A.   One time.

6      Q.   So, is it your position then that there

7  were no other gaps?  And by gaps I'm saying, let's say

8  your policy went from January 1st of one year to

9  December 31st of that year, so it's a year policy.

10      Is it your position that there was never a

11  gap in coverage as well where there may be a month like

12  what you said?  You had that one time where you went

13  thirty days without getting insurance and then got it,

14  so there was a time period there when your home was not

15  insured.  Other than that one time, you're saying there

16  were no other gaps in the insurance, is that correct?

17      A.   No, correct.

18      Q.   Do you recall when that was that there was

19  the one month gap in the insurance?

20      A.   Let me think.  It was either '04 or '05.

21      MR. RIEMER:  Reid, she'll tell you

22      everything she remembers about that, but I think

23      one of the things we're struggling with, I don't

Case 09-01137   Doc 18-1   Filed 07/12/10   Entered 07/12/10 17:02:33   Desc  Exhibit
A   Part 1   Page 17 of 61

1        think we're going to know until we get the

2        information from the insurance company if that

3        created really a lapse.  If you pay it within a

4        certain period it gets reinstated without any

5        kind of gap in coverage.

6             I have no idea if that happened or if there

7        actually was a gap.

8             MR. MANLEY:  Okay.

9   BY MR. MANLEY:

10       Q.   I'm going to come back to some insurance

11  issues in just a little while.  I have more documents to

12  ask you about.  I'm sorry.

13       A.   He knows more about this than I do.

14            MR. RIEMER:  Tell him what you know.

15            (Whereupon, Defendant's Exhibit #4 was

16             received and marked for identification)

17  BY MR. MANLEY:

18       Q.   I'm going to represent to you that this is

19  the escrow waiver agreement that you guys signed with

20  respect to the ABM-AMRO loan.

21            Do you recall signing an escrow waiver

22  agreement where the mortgage company agreed to waive the

23  requirement that an escrow account be set up?

Case 09-01137   Doc 18-1   Filed 07/12/10   Entered 07/12/10 17:02:33   Desc Exhibit
A   Part 1   Page 18 of 61

1           MR. RIEMER:  If you don't know the answer

2      say you don't.  He'll have a chance to fill in

3      the gaps.

4           The question is:  Do you remember signing

5      the escrow waiver agreement?

6           THE WITNESS:  I can't lie.  No, I don't.

7  BY MR. MANLEY:

8      Q.    That's fine.  There's nothing wrong with

9  that.  I'm just trying to ask you questions and you may

10  know the answer to some and may not know the answer to

11  others, so that's fine.

12      A.    Can I explain something?

13      Q.    Sure.

14      A.    He went and took care of all this and then

15  I went on my lunch break and met Janice at her office and

16  signed.  That's why --

17      Q.    Are you familiar with the fact that you

18  guys had signed an escrow waiver agreement so there

19  wouldn't be an escrow account set up with the loan?

20      A.    Yes.

21      Q.    Why did you guys decide to do that, do you

22  recall?

23      A.    No.

1        Q.    And again, because you're having difficulty

2    reading I'm going to kind of paraphrase this, but this

3    agreement is where the lender waives the escrow

4    requirement in exchange for certain things from you

5    guys, and one of them is that you pay the taxes and the

6    insurance on the account.  Is that your understanding of

7    the escrow waiver agreement?

8        A.    Yes, sir.

9        Q.    Are you also familiar with the requirement

10   that's found in the waiver agreement that you guys

11   provide proof that you paid the taxes and the insurance

12   to the mortgage company?

13       A.    Yes.

14       Q.    And then if you fail to comply with that

15   that's considered a default under the agreement in the

16   note and security agreement?

17            MR. RIEMER:  I'm going to object.  Whatever

18        it says it says.  It speaks for itself.

19            But you can answer, try to answer his

20        question.

21            THE WITNESS:  Ask it again.

22   BY MR. MANLEY:

23       Q.    If you look at paragraph six it says,

Case 09-01137   Doc 18-1   Filed 07/12/10   Entered 07/12/10 17:02:33   Desc Exhibit A   Part 1   Page 20 of 61

1    "borrower's failure to comply in a timely manner with

2    all the terms hereof shall constitute a default under

3    this agreement and the note and the security agreement."

4             MR. RIEMER:  Same objection.

5    BY MR. MANLEY:

6        Q.    Do you understand what that means?

7        A.    Yes.

8        Q.    Let's back up because you told me a piece

9    of information here and I'm going to follow-up with

10   that.  You said at closing your husband really handled

11   all the aspects of that, is that correct?

12       A.    Yes.

13       Q.    Did your husband also handle, I mean, was

14   he the one who made the decision to go get the ABM loan

15   initially?

16       A.    We did it together, we talked about that

17   together.

18       Q.    Did you all go and meet with the lady?  I

19   think you told me, what's her name, Janice?

20       A.    Janice Johnson.

21       Q.    Did you all go meet with her together?

22       A.    He met with Janice and she ran his credit

23   report and this, that and the other and she got the

Case 09-01137   Doc 18-1   Filed 07/12/10   Entered 07/12/10 17:02:33   Desc Exhibit
A   Part 1   Page 21 of 61

1   paperwork ready.

2          Q.    And then he went in on, I assume,

3   November 21st of 2002 and signed the documents, is that

4   correct?

5          A.    Yes.

6          Q.    And you weren't with him when that

7   happened?

8          A.    I went just hours after he went.

9          Q.    And I think you said you weren't involved

10  really, or were you involved in the negotiations for the

11  escrow waiver agreement?

12         A.    Yes.

13         Q.    But you don't remember why you all decided

14  to seek a waiver of escrow requirement?

15         A.    No, I don't.

16         Q.    And then you went in on your lunch break

17  and signed whatever documents you were required to sign,

18  is that right?

19         A.    Yes.

20         Q.    So, your husband probably knows more about

21  maybe the negotiations that took place to get that loan

22  than you do?

23         A.    Well, we both talked with Janice.  She more

1    or less suggested, if I'm not mistaken, she suggested

2    that.

3           Q.    Do you recall why she suggested that?

4           A.    No.  It's been twenty-three years ago.  I

5    can't remember all that.

6           Q.    Well, this loan was 2002.

7           A.    That's right.  I'm sorry.

8           Q.    I know this is hard to keep up with.

9           A.    I can't remember why, but I know Janice

10   went over some stuff with me that day and we agreed not

11   to be in escrow, but I can't remember what for, I mean,

12   why we didn't.

13                (Whereupon, Defendant's Exhibit #5 was

14                received and marked for identification)

15   BY MR. MANLEY:

16          Q.    Let me show you what I marked as Exhibit 5

17   to your deposition.  We have some small writing again.

18   I apologize.  If I had known I would have gotten these

19   documents a little bit bigger.

20          A.    It don't matter how big it is, my eyes --

21          Q.    I can interpret again and your attorney

22   can maybe tell me if I'm reading this wrong or

23   something.

Case 09-01137   Doc 18-1   Filed 07/12/10   Entered 07/12/10 17:02:33   Desc Exhibit
A   Part 1   Page 23 of 61

1                But this is an insurance authorization

2   form for that ABM-AMRO loan and it was actually produced

3   by you guys.  It's Soutullo 00004.

4                MR. RIEMER:  That's the bates number.

5   BY MR. MANLEY:

6        Q.    The bates number down at the bottom.

7        A.    Uh-huh.

8        Q.    And this document says, "the security

9   instrument" -- and then there's some words in the

10  parenthesis -- "which secures the loan noted above

11  requires that proper fire, hazard, flood and/or other

12  property insurance be carried in the amount of the loan

13  to protect you and also the lender and authorizes us to

14  obtain the insurance in your behalf if you fail to do

15  so."  That's the first paragraph there.

16               Then the second paragraph says, "the

17  insurance policies may be provided by an agent of your

18  choice, however, policies or evidences of insurance in a

19  form reasonably acceptable to us must be in our office

20  prior to the closing of the loan.

21               Also, a renewal policy for each policy

22  must be in our office at least fifteen days prior to the

23  expiration date of the previous policy."

Case 09-01137   Doc 18-1   Filed 07/12/10   Entered 07/12/10 17:02:33   Desc Exhibit A   Part 1   Page 24 of 61

1          Do you understand what that means?

2     A.   Yes.

3     Q.   Did you always comply with that by sending

4    in the proof of insurance fifteen days before the policy

5    would expire?

6     A.   My insurance company would fax it in.

7     Q.   They faxed it in fifteen days before?

8     A.   We talked up there one day and she said

9    they sent it in, I guess yearly or whatever they send it

10   in to the insurance company.

11    Q.   But you don't know when they would do it?

12    A.   No.

13    Q.   And then the last sentence of that second

14   paragraph there says, "in the event any renewal policy

15   is not in our office within the required time we will

16   order a renewal policy in like amount and for like

17   coverages from an agent of our choice."  Do you see

18   that?

19    A.   Yes.

20    Q.   Let's talk about your insurance because

21   you mentioned that your insurance agent would send the

22   insurance information in.  Who is your insurance agent?

23    A.   Tommy Lambert.

Case 09-01137   Doc 18-1   Filed 07/12/10   Entered 07/12/10 17:02:33   Desc  Exhibit
A   Part 1   Page 25 of 61

1          Q.     And has Mr. Lambert been your insurance

2     agent since 2002, when you took this loan out?

3          A.     He was our insurance agent for twenty-seven

4     years.  He retired this year.

5          Q.     When did he retire?

6          A.     It was the first part of this year.  I

7     can't remember exactly.

8          Q.     But he retired in 2010 some time?

9          A.     Yeah.

10          Q.     Where is his office located?

11          A.     98.

12          Q.     Highway 98?

13          A.     Yes.

14          Q.     Where is that?

15          A.     It's in Semmes.

16          Q.     Semmes?

17          A.     Uh-huh.

18                 MR. RIEMER:  S-E-M-M-E-S.

19     BY MR. MANLEY:

20          Q.     98 in Semmes, is that Alabama?

21          A.     Uh-huh.

22          Q.     Is his office still located there?

23          A.     Yes.

Case 09-01137   Doc 18-1   Filed 07/12/10   Entered 07/12/10 17:02:33   Desc Exhibit
A   Part 1   Page 26 of 61

1          Q.    Since filing this lawsuit have you talked

2    to Mr. Lambert or anybody in his office?

3          A.    Yes.

4          Q.    Who did you talk to in his office?

5          A.    I forgot the lady's name.  Let me explain

6    something.  When I was talking to Mr. Miller, before

7    they foreclosed on us I had to go up there and I think

8    she pulled up three or four years because that's what he

9    asked me for and I faxed that to him.  I can't remember

10   her name.

11         Q.    When was that?  That wouldn't have been

12   since you filed this lawsuit then, would it?

13         A.    No.  This was in, I think it was November

14   or December of 2009.

15         Q.    But you spoke with a lady there?

16         A.    Yeah.

17         Q.    And you don't remember her name?

18         A.    No.

19               MR. RIEMER:  Was it the same lady that

20         faxed us that stuff?

21               MR. MANLEY:  Yes.

22               MR. RIEMER:  We both have that, so I'm sure

23         it will come back to you.

1    BY MR. MANLEY:

2         Q.    Is Tommy Lambert, was he an Alfa agent?

3         A.    Uh-huh.

4         Q.    Your insurance, from taking this loan out

5    on November 21st, 2002 through the present, has always

6    been with Alfa?

7         A.    Correct.

8         Q.    Has your insurance in Lucedale on your

9    Lucedale home, is that with Alfa also?

10        A.    It was at one time.

11        Q.    It's not anymore?

12        A.    Huh-uh.

13        Q.    Who has your insurance on your Lucedale

14   home?

15        A.    I can't remember.

16        Q.    You told me about one conversation you had

17   during the foreclosure process where you called Tommy

18   Lambert's office and spoke with a lady and had her send

19   information to, you said, a Mr. Miller?

20        A.    I went to the office and she gave me the

21   paperwork and I faxed it to Mr. Miller, along with the

22   returned checks and a copy where we had paid our land

23   taxes for four or five years.

Case 09-01137   Doc 18-1   Filed 07/12/10   Entered 07/12/10 17:02:33   Desc Exhibit
A   Part 1   Page 28 of 61

1          Q.    Let's go back from November of 2002 to the

2     present.  You told me about one communication you had

3     with Mr. Lambert's office.  I want to know about all the

4     communications you've had with Mr. Lambert's office about

5     your homeowner's insurance on the Catherine Creek Drive

6     property.

7          A.    Back in 2005 when the storm came through we

8     had a small claim.  Other than that I've just paid my

9     insurance, never had no problems.

10         Q.    So, you remember dealing with them when you

11    filed a claim in '05?

12         A.    Correct.

13         Q.    You dealt with them in November or December

14    of '09 --

15         A.    Yes.

16         Q.    -- when you went into the office.  And then

17    other than that your only communications with them has

18    been sending checks in for your policies?

19         A.    Correct, yes.

20         Q.    Did you have any communications with them

21    at the time you told me about where there was a month

22    where you hadn't paid your insurance?

23         A.    Yes.  I'm sorry, I forgot about that.  I

1    went in the office that day and paid my insurance and I

2    told him, I said, make sure you send a copy to the

3    mortgage company because I don't want no problems.

4              He looked up on the computer and he said,

5    well, they have not made no claim or whatever.  So, he

6    supposedly took care of that.

7         Q.    So, that's three instances where you've

8    had contact with them, the one time where there was a

9    month you told me about, and I understand you don't know

10   if there was actually a gap there or not, but I'm going

11   to say gap right now because we don't know and there's

12   no other good way to say it, but there was a month where

13   you went in and paid your premiums, you had a

14   conversation with them then.

15             You had conversations with them about the

16   claim you made on your house when Hurricane Katrina came

17   through.

18        A.    Yes.

19        Q.    And then you went into the office in

20   November or December of 2009 and obtained documents

21   showing you had paid your insurance?

22        A.    I was wrong, that was 2008 because in 2009

23   is when they -- in April is when they foreclosed on us,

1    so that was '08.

2         Q.    You're saying they actually foreclosed on

3    your house?

4         A.    Yes.

5         MR. RIEMER:   I think she means they put a

6        notice.

7         THE WITNESS:   Well, we stopped it.

8    BY MR. MANLEY:

9         Q.    They hadn't foreclosed?

10        A.    Yeah.

11        Q.    How do you know that Alfa actually

12    provided proof of insurance to CitiMortgage or ABM?

13    Would you ever receive copies of the information they

14    sent in?

15        A.    It seems like I asked that girl that day

16    and I can't remember what she said. She said something,

17    you know, I guess they send it in yearly may be what she

18    said. I can't remember really exactly what she said. I

19    dealt with a lot during that time.

20        Q.    This was November or December of 2008, that

21    time you went into the office?

22        A.    Yes.

23        Q.    So, that was the only communication you had

Case 09-01137    Doc 18-1    Filed 07/12/10    Entered 07/12/10 17:02:33    Desc Exhibit
A   Part 1    Page 31 of 61

1   with Alfa about whether or not they sent proof of

2   insurance to the mortgage company?

3          A.    Well, during this time, when Mr. Miller, he

4   didn't know if it was in the beginning it was the

5   payments I had to send proof of the payments.  Then they

6   said it was the land taxes and then they said it was the

7   insurance.

8               She said, the mortgage company has not paid

9   your insurance and, you know, it had my mortgage company

10  and all on the screen.  That's when she gave me the

11  copies where we had paid our insurance.

12         Q.    Okay.  Mr. Miller was the foreclosure

13  attorney?

14         A.    Yes.

15         Q.    Do you remember what firm he was with?

16         A.    No, I don't.

17         Q.    But any other discussions with Mr. Lambert

18  or his office or anybody at Alfa with respect to how they

19  provided proof of insurance to the mortgage company other

20  than what you've told me?

21         A.    That's correct, that's all.

22         Q.    Were you the one out of the two of you who

23  handled those things or did your husband ever get

Case 09-01137   Doc 18-1   Filed 07/12/10   Entered 07/12/10 17:02:33   Desc Exhibit
A   Part 1   Page 32 of 61

```
1    involved?

2         A.    You're talking about the --

3         Q.    The insurance and taxes on the account.

4         A.    We both paid it over the years, you know.

5         Q.    But would you all get involved with the

6    mortgage company when they would send you a notice saying

7    we didn't show proof of insurance?

8         A.    We never received that.

9               (Whereupon, Defendant's Exhibit #6 was

10              received and marked for identification)

11   BY MR. MANLEY:

12        Q.    Let me show you what I marked as Exhibit 6

13   here.  This may be kind of hard to read.

14        A.    I can't remember getting one of these.

15        Q.    And just for the record, Defendant's

16   Exhibit 6, and flip through it if you would just so

17   you're familiar with it, but it's a number of documents

18   that was sent by ABM-AMRO and at the end there's some

19   documents sent by CitiMortgage relating to proof of

20   insurance and the fact that they didn't have it.  That's

21   essentially what those letters deal with.  Is that your

22   understanding?

23        A.    Yes.
```

Case 09-01137   Doc 18-1   Filed 07/12/10   Entered 07/12/10 17:02:33   Desc Exhibit
A   Part 1   Page 33 of 61

1      Q.    And you're saying you didn't receive any of

2   those letters?

3      A.    I can't remember getting any.  I mean, I

4   never talked with anyone.  Let me see, I'm trying to

5   think of something.  I never remember getting any calls

6   from our mortgage company except one time, it was in

7   2004, I believe, where they were telling me that they

8   had paid my land taxes.

9              I went and got my checkbook and I said, no,

10  ma'am, you didn't pay my land taxes.  She asked me if I

11  could go get proof.  I said, yes, ma'am.  She gave me a

12  lot number during this time.  She was trying to say, I

13  can't remember exactly what it was, but it was something.

14             I went down and pulled up where we had paid

15  our taxes and the lady pulled up where my mortgage

16  company had paid my nephew's, or his nephew's land taxes

17  because it seems like they had paid a hundred seventy

18  some-odd dollars and our land taxes was more than that.

19             I got her proof and I faxed it to them.

20  That's the only time I can remember my mortgage company

21  contacting me about insurance, land taxes or anything

22  until CitiMortgage took over.

23      Q.    So, before, and I believe we established

Case 09-01137   Doc 18-1   Filed 07/12/10   Entered 07/12/10 17:02:33   Desc Exhibit
A   Part 1   Page 34 of 61

1 in our deposition when your attorney took CitiMortgage's

2 deposition that that happened about August or September

3 of '07 --

4          MR. RIEMER:  The switch-over.

5 BY MR. MANLEY:

6          Q.    -- the switch-over from ABM to

7 CitiMortgage.

8          A.    Yes.

9          Q.    You're saying prior to that time period of

10 August or September of '07 you only had one conversation

11 with anybody at ABM-AMRO about taxes or insurance?

12          A.    Yes.

13          Q.    Let's talk about after CitiMortgage took

14 over, which was I think it may have been September of '07

15 was the date, but it's right around August or September.

16 Tell me about any communications you had with anybody at

17 CitiMortgage relating to your taxes or your insurance.

18          A.    I paid my August bill.

19          Q.    What year was that?

20          A.    '07.

21          Q.    August, what bill are we talking about

22 here?

23          A.    My mortgage payment.  And then in September

1    I go to the mailbox to send my bills off and there's a

2    CitiMortgage.  I opened it up.  It had my account number

3    from ABM.  I went back to the house and I called them.

4    They had the same numbers, ABM.

5              She told me they had swapped over.  I tore

6    that check up and made another check out to

7    CitiMortgage.  I never had no problems in '07 until, I

8    want to say it was around April, May, somewhere around

9    there they started calling us about a payment.

10        Q.    Of '08?

11        A.    Of '08.  Several times I went and got my

12   checkbook and checked to make sure my checks had cleared

13   the banks.  Everything was fine.  This went on for

14   months, them just calling wanting me to send payments.

15             One month I sent an extra payment because

16   I had received my statement and it wasn't showing up.

17   But the following month it had cleared my bank.  They

18   never said nothing about no insurance or no land taxes.

19   It was always a payment.

20             So, the first time I sent in, I think it

21   was nine checks.  And I can't remember the lady's name

22   that I sent them to.

23             MR. RIEMER:  Who was she with?

Case 09-01137   Doc 18-1   Filed 07/12/10   Entered 07/12/10 17:02:33   Desc Exhibit
A   Part 1   Page 36 of 61

1            THE WITNESS:  Citi.

2            During this time they still couldn't -- it

3       was still -- the notes was behind, the notes was

4       behind, that's all they ever told me until I

5       started talking to Mr. Miller.

6  BY MR. MANLEY:

7       Q.   Mr. Miller is with the foreclosure firm, is

8  that right?

9       A.   He was their lawyer.  And he kept trying

10  to tell me we was in escrow.  I said, no, sir, we're

11  not.  So, I had to go get our mortgage stuff and I had

12  to fax some stuff in to him proving we wasn't in escrow.

13            During this time he said he didn't really

14  know what the problem was.  He never mentioned insurance

15  in the beginning, you know.  It was land taxes.

16            So, that's when I go and get the proof

17  where we paid the land taxes and faxed that in to him

18  and faxed, I can't remember if it was eighteen or

19  nineteen checks, where they had cleared my bank.  By then

20  this was, I think, November or December.

21       Q.   Of '08?

22       A.   Of '08.  And then in January Citi sent our

23  check back, so I contacted Mr. Miller.  He assured me

Case 09-01137   Doc 18-1   Filed 07/12/10   Entered 07/12/10 17:02:33   Desc Exhibit
A   Part 1   Page 37 of 61

1   that he was handling it and we were going to try to find

2   out what was going on.

3          The next thing I know, we get a letter

4   through the mail where they are foreclosing on us.

5   That's when we went and filed Chapter 13 to stop it.

6          Q.   So, other than what you just told me about,

7   you haven't had any other conversations with anybody at

8   CitiMortgage?

9          A.   That's it.  In the beginning now, about

10  the late payments I talked to several, several, Donnie

11  did too, trying to say we were late on the house

12  payments.

13         Q.   You've told me about those.  Do you

14  remember how many times you spoke with somebody at

15  CitiMortgage?

16         A.   In the beginning, let me say this, the

17  lady that I talked to, I think it was in April or May,

18  she was trying to say we were thirteen months or

19  thirteen hundred dollars, something like that.  And

20  finally, I said I sent the nine returned checks in to

21  them trying to prove we wasn't late.

22         Q.   How many communications do you think you

23  had with CitiMortgage about late payments?

Case 09-01137   Doc 18-1   Filed 07/12/10   Entered 07/12/10 17:02:33   Desc Exhibit
A   Part 1   Page 38 of 61

```
 1        A.    Oh, God, my phone never quit ringing.

 2        Q.    How many do you think?

 3        A.    It was every day for months.  I don't even

 4   know.  It got to the point where we wouldn't even answer

 5   the phone because we was telling them the same thing

 6   over and over again and they couldn't find the problem.

 7   I didn't know what else to do.  They assured me that they

 8   were going to find the problem and fix it.

 9        Q.    Let's go back to these letters here.  Is

10   that your correct address on the letter?

11        A.    That's where the house is at.

12        Q.    Is that where you were getting mail?

13        A.    Yes.

14        Q.    Were you receiving statements each month

15   from CitiMortgage?

16        A.    Yes.

17        Q.    Were you receiving statements from

18   ABM-AMRO?

19        A.    No.

20        Q.    You never received statements from them?

21        A.    Not when CitiMortgage took it over.

22        Q.    I'm talking before that.

23        A.    No.  I had a book, a payment book.
```

Case 09-01137   Doc 18-1   Filed 07/12/10   Entered 07/12/10 17:02:33   Desc  Exhibit
A   Part 1   Page 39 of 61

1        Q.    They never sent you statements in the

2   mail?

3        A.    No.

4        Q.    But when CitiMortgage took over they sent

5   you statements in the mail?

6        A.    Yes.

7        Q.    Did you save any of those statements?

8        A.    No, I did not.

9        Q.    Do you recall sitting down and looking at

10  those statements to see what they showed, whether they

11  showed that they were charging for taxes and insurance on

12  the statements?

13       A.    I think one time we did.  I can't remember

14  when it was.  I want to say that was during one time I

15  had called them concerning it and talked with someone.

16  You don't never get the same person.

17       Q.    Are you talking at ABM or CitiMortgage?

18       A.    CitiMortgage.

19       Q.    Okay.  At some point you knew they were

20  charging for insurance and taxes?

21       A.    No, I don't think it said insurance or

22  taxes.  It was like we were late on a payment.  From

23  what I can remember, it had something to do with the

Case 09-01137    Doc 18-1    Filed 07/12/10    Entered 07/12/10 17:02:33    Desc Exhibit
A    Part 1    Page 40 of 61

1   payments was late.

2          I can never remember them mentioning

3   anything about the land taxes or the insurance except

4   in '04 when they called me and told me they had paid my

5   land taxes.

6        Q.   If CitiMortgage's notes showed differently,

7   that maybe you guys did have some conversations about the

8   taxes and insurance other than what you're telling me

9   would you dispute that?

10        A.   No.  Like in '07 we talked about insurance

11   and I explained to them that they had paid my nephew's

12   land taxes.  I tried to explain to them there had to be

13   a problem there somewhere.

14          I don't know if maybe she mentioned it or

15   we was talking about.  I knew there had to be a problem,

16   but I never knew why until I talked to Mr. Miller.

17        Q.   Back to Exhibit 6 here, you're saying you

18   don't remember receiving any of these notices regarding

19   insurance, is that correct?

20        A.   Correct.

21        Q.   And flip through them, if you would,

22   because I want to make sure you've looked at every one of

23   these.

Case 09-01137   Doc 18-1   Filed 07/12/10   Entered 07/12/10 17:02:33   Desc Exhibit
A   Part 1   Page 41 of 61

A. You want me to flip through all of them?
Q. Yeah.
MR. RIEMER: The question still is, do you remember ever getting any of this, right?
MR. MANLEY: Yeah.
THE WITNESS: If I did, I can't remember it.
BY MR. MANLEY:
Q. I want you to flip through all of them because there's some later letters in here too from CitiMortgage. I just wanted you to get through everything.
THE WITNESS: The last few, didn't I give them to you?
MR. RIEMER: What she sent us about the payments, the last thing she -- are you talking about from the insurance company?
THE WITNESS: No, from the mortgage company. Isn't that what you asked me?
BY MR. MANLEY:
Q. Right now I want to finish getting through this, if we could, through Exhibit 6. Maybe your answer will be the same, 'you don't remember receiving these

1    things,' and that's fine.  I just need to know that.

2         A.    He might could --

3         Q.    Okay.

4         A.    I can't remember.

5         Q.    That's fine.  I want you to look through

6    them to make sure there's nothing in there that jogs your

7    memory.

8         So, you've flipped through all of them.

9    You still don't remember receiving any of those letters?

10        A.    No.

11        Q.    You said you were familiar with them.

12    Apparently you had maybe looked at them before the

13    deposition, is that right?

14        A.    Right.

15        Q.    What these letters say, though, is that

16    they would notify you that they didn't have proof of

17    insurance generally.

18         And you see some in here after that

19    happened where they would say -- and these are

20    generalizations and you can tell me if you agree or

21    not -- there would be a letter saying, 'we show your

22    insurance has expired and we don't have proof of new

23    insurance.  Provide proof?'

```
1               Then they would send another letter

2    saying, 'we don't have proof.  We force placed

3    insurance.'  Then there was another letter saying, 'we

4    now cancelled force placed insurance because other

5    insurance has been provided.'

6               Is that generally your understanding what

7    the letters say?

8         A.    Yes.

9         Q.    Would it make sense that somebody was

10   getting those letters and would provide insurance

11   coverage at that point?

12              MR. RIEMER:  Object.

13              If you know.  Go ahead.

14              THE WITNESS:  I can't remember getting the

15              letters.  And if I did I didn't follow through

16              with reading them.  I just know I paid my

17              insurance.

18   BY MR. MANLEY:

19        Q.    Let's turn to the back.  And turn to bates

20   number 521.  It's where the letters start coming from

21   CitiMortgage.  I'll flip for you here.  That's kind of

22   where it starts.

23              It looks like at some point they started
```

1    activity in your escrow account from 7/01/07 through

2    9/05/07." Then below that it says, "your monthly

3    mortgage payment for the past year was six twenty-one,

4    fifty-three, of which a hundred sixty-nine dollars and

5    seventy-nine cents was for your escrow account."

6            Do you see that? You might not can read

7    that, but that's what it says. That doesn't refresh your

8    recollection as to receiving this document?

9        A.    No, sir.

10       Q.    You could have received these documents,

11   you just don't remember?

12       A.    I don't remember getting them.

13           (Whereupon, Defendant's Exhibit #10 was

14            received and marked for identification)

15   BY MR. MANLEY:

16       Q.    I'm going to show you what I marked as

17   Exhibit 10 to your deposition. It's one of the

18   documents you guys produced, it's bates number Soutullo

19   25. It's a letter, it looks like, from CitiMortgage to

20   your husband at the Lucedale address. Are you familiar

21   with this document?

22       A.    Yes, I remember getting this one.

23       Q.    Is that your handwriting on there?

1     A.     Uh-huh.

2     Q.     You wrote the name "Mike Miller?"

3     A.     Yeah.

4     Q.     And you wrote a phone number on there. Was

5 he the attorney you've been talking about on the

6 foreclosure side of things?

7     A.     Correct.

8     Q.     It looks like on December 30th, 2008

9 CitiMortgage returned a check to you for four fifty-two,

10 is that right?

11     A.     Yes.

12     Q.     When you received this letter what did you

13 do?

14     A.     During this time I think is when I talked

15 with Mike Miller, so he gave me his fax number and I

16 faxed him a bunch of stuff, like I said before, so that

17 he could try to take care of all this.

18     Q.     So, you kind of told me about your

19 communications with Mike.

20     A.     Right.

21     Q.     You called this number, the Sirote, Permutt

22 firm, you called that number and got Mr. Miller on the

23 phone?

Case 09-01137   Doc 18-1   Filed 07/12/10   Entered 07/12/10 17:02:33   Desc Exhibit A   Part 1   Page 46 of 61

1    you tell me how you've been damaged by CitiMortgage?

2         A.    I don't know if I can explain it.  Well,

3    in the beginning when we first got the -- I was dealing

4    with everything, talking back and forth.

5             Donnie gets the letter out of the mailbox,

6    it might have been my truck.  Anyway, they were

7    foreclosing.  I thought we were going to divorce.  We

8    had one of the most awful, un-Godliest -- I guess we've

9    never had an argument like that.

10            Yeah, it's put stress on me.  It's caused

11   me to not sleep.  We're paying out more now than we've

12   ever paid because of this Chapter 13.  You live on a

13   budget because we're self-employed, therefore, I'm going

14   to make sure I've got that money to pay that.

15            Knowing that it's messed our credit up it's

16   a lot of mental stress.  I mean, it's just a lot of

17   stress.  It has really caused me a lot of sleepless

18   nights, worrying if I've done anything.

19            Like I told Ken, if I had thought that

20   much that I had done something wrong I would have packed

21   a bag that day in the backyard and left because that's

22   how bad the argument was.  We have never fussed like

23   that.  It's caused tension and it still -- it's still

Case 09-01137   Doc 18-1   Filed 07/12/10   Entered 07/12/10 17:02:33   Desc Exhibit
A   Part 1   Page 47 of 61

1    rough.

2         Q.    In your interrogatories you mentioned

3    about trying to get another loan.  Have you tried to get

4    another loan?

5         A.    Well, we -- James pulled our credit report

6    up.  We was going to -- I don't know what we was going

7    to do, but anyway, it showed up on our credit, the

8    Chapter 13.

9         Q.    This was when?

10         Just answer if you know.  I'll ask him

11    these questions too.

12         A.    I guess it's been about a year ago, not

13    quite a year ago.

14         Q.    You were looking to maybe refinance or was

15    this for the same loan for the house on Catherine Creek?

16         A.    No.  I can't remember.  I can't remember

17    what we done it for.  It didn't show up on my credit

18    because -- I don't think it has.

19         Now, I have gotten a letter from Chapter 13

20    with my name on there, so I'm liable to be in there with

21    it.  I don't know.  I got to check on that.  I don't have

22    my credit in my name because I never got a check or

23    whatever.  I got a little bit of credit, but it was

Case 09-01137   Doc 18-1   Filed 07/12/10   Entered 07/12/10 17:02:33   Desc  Exhibit
A   Part 1   Page 48 of 61

1    because of him, but not enough to go borrow no money or

2    finance a house.

3                I can't remember what we done it for.  But

4    we pulled a credit report and it's against him.

5         Q.    That was about a year ago?

6         A.    I can't remember.

7         Q.    And you don't know --

8         A.    Maybe not that long ago.  Maybe I had to do

9    it for Ken.  I don't remember, but we done it.

10        Q.    You don't know if you pulled it for trying

11   to get a loan or if you pulled it for your attorney?

12        A.    I can't remember.  I know we pulled one

13   for him.  Janice pulled one because I know it cost us

14   either twenty-five or fifty dollars.  This was before

15   Ken.

16                MR. RIEMER:  If this is something he knows

17              more about, don't guess.  Just tell him what you

18              know.

19                THE WITNESS:  It was on there, that's all I

20              know.

21   BY MR. MANLEY:

22        Q.    On his credit?

23        A.    Uh-huh.

# NOTE

NOVEMBER 21, 2002          MOBILE                          ALABAMA
[Date]                     [City]                          [State]

▆▆▆▆▆ CATHERINE CREEK DR, MOBILE, AL 36695
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S.   $54,400.00   (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is  ABN AMRO MORTGAGE GROUP, INC., A DELAWARE CORPORATION.

I will make all payments under this Note in the form of cash, check or money order.
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of  5.750%.
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments
I will pay principal and interest by making a payment every month.
I will make my monthly payment on the   1ST   day of each month beginning on  JANUARY 1, 2003.
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on   DECEMBER 1, 2017,   I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at
4242 N. HARLEM AVE.
NORRIDGE, IL 60706
ATTN: CASHIERING
or at a different place if required by the Note Holder.
(B) Amount of Monthly Payments
My monthly payment will be in the amount of U.S.   $451.74.

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.
I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charge for Overdue Payments
If the Note Holder has not received the full amount of any monthly payment by the end of   15   calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be   5.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.
(C) Notice of Default
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.
(D) No Waiver By Note Holder
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

Initials: _D.W.S._

MULTISTATE FIXED RATE NOTE–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3200 1/01
© 1999-2002 Online Documents, Inc.          Page 1 of 2                    F3200NOT 0208

DEFENDANT'S EXHIBIT

1   T. Scott

CITIMORTGAGE/SOUTULLO000075

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do those things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

CAUTION -- IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.

_Donald N Soutullo_ (Seal)
DONALD N SOUTULLO

[Sign Original Only]

CITIMORTGAGE/SOUTULLO000076

*Kyle*

When recorded mail to:
ABN AMRO MORTGAGE GROUP, INC.
P.O. BOX 5064
TROY, MICHIGAN 48084
ATTN:FINAL/TRAILING DOCUMENTS

2002094537  Book-5269  Page-1145
Total Number of Pages: 9

2004014721  Book-5550  Page-1414
Total Number of Pages: 9

23 52
81.60
105.10
10.00
71.00  This instrument was prepared by:    Cliff Meggison
117.10                                   Interfirst, a Division of ABN Amro Mortgage Group, Inc.
                                         777 E. Eisenhower, Suite 700
                                         Ann Arbor, MI 48108

*THIS MORTGAGE IS BEING RE-RECORDED TO CORRECT LEGAL DESCRIPTION.*

———————————— [Space Above This Line For Recording Data] ————————————

LOAN #:

### CORRECTIVE MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated **NOVEMBER 21, 2002**, together with all Riders to this document.

(B) "Borrower" is **DONALD N SOUTULLO, A MARRIED MAN.** Joined by his wife, Tammy Soutullo

Borrower is the mortgagor under this Security Instrument.

(C) "Lender" is **ABN AMRO MORTGAGE GROUP, INC.**

Lender is a **CORPORATION** organized and existing under the laws of **DELAWARE.** Lender's address is **2600 W. BIG BEAVER RD., TROY, MICHIGAN 48084.**

Lender is the mortgagee under this Security Instrument.

(D) "Note" means the promissory note signed by Borrower and dated **NOVEMBER 21, 2002.** The Note states that Borrower owes ************************************FIFTY FOUR THOUSAND FOUR HUNDRED AND NO/100 ********************************************** Dollars (U.S. **$54,400.00** ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **DECEMBER 1, 2017.**

(E) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider      ☐ Condominium Rider          ☐ Second Home Rider
☐ Balloon Rider              ☐ Planned Unit Development Rider   ☐ Other(s) [specify]
☐ 1-4 Family Rider           ☐ Biweekly Payment Rider

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(K) "Escrow Items" means those items that are described in Section 3.

(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii)

ALABAMA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3001 1/01                                                Page 1 of 8

Initials:                ALUDEED 0008
         J a S



DEFENDANT'S EXHIBIT

2  *T. Sou...*

**CITIMORTGAGE/SOUTULLO000001**

condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably mortgages, grants and conveys to Lender, with power of sale, the following described property located in the
**COUNTY** [Type of Recording Jurisdiction] of [Name of Recording Jurisdiction]:

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF.

The proceeds of this loan have been applied to the refinance of the property.

which currently has the address of ████████ A CATHERINE CREEK DR, MOBILE,
[Street] [City]

Alabama   36695           ("Property Address"):
      [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any

ALABAMA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3001 1/01                                                Page 2 of 8

Initials: [handwritten initials]

CITIMORTGAGE/SOUTULLO000002

remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which

ALABAMA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3001 1/01
Page 3 of 8

Initials: [handwritten initials]
ALUREDO
[handwritten initials]

CITIMORTGAGE/SOUTULLO000003

reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under

ALABAMA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3001 1/01                                                  Page 4 of 8

Initials:

any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the

Initials:

CITIMORTGAGE/SOUTULLO000005

Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

ALABAMA --Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3001 1/01                                    Page 6 of 8

Initials: _DW_ _SL_ _JS_

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other

ALABAMA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3001 1/01                                          Page 7 of 8

Initials: [signature]

CITIMORTGAGE/SOUTULLO000007

remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give a copy of a notice to Borrower in the manner provided in Section 15. Lender shall publish the notice of sale once a week for three consecutive weeks in a newspaper published in _Mobile_ County, Alabama, and thereupon shall sell the Property to the highest bidder at public auction at the front door of the County Courthouse of this County. Lender shall deliver to the purchaser Lender's deed conveying the Property. Lender or its designee may purchase the Property at any sale. Borrower covenants and agrees that the proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waivers. Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_Donald W Soutullo_ (Seal)
DONALD W SOUTULLO

_Tammy Soutullo_
Tammy Soutullo

STATE OF ALABAMA )
County of ___Mobile___ )

On this __21st__ day of __November__ , I _Conne Dickson_ a Notary Public in and for said county and in said state, hereby certify that DONALD W SOUTULLO, and Tammy Soutullo whose name(s) ___are___ signed to the foregoing conveyance, and who ___are___ known to me, acknowledged before me that, being informed of the contents of the conveyance, ___they___ executed the same voluntarily and as ___their___ act on the day the same bears date.

Given under my hand and seal of office this 21st day of __November__ .

Notary Public

My commission expires: __6-22-05__

CITIMORTGAGE/SOUTULLO000008

EXHIBIT "A"

COMMENCING AT THE SOUTHEAST CORNER OF THE NORTHWEST QUARTER
OF SECTION 17, TOWNSHIP 4 SOUTH, RANGE 3 WEST, THENCE N
00°35' W, A DISTANCE OF 390.90 FEET, THENCE S 89°25' W, A
DISTANCE OF 667.00 FEET TO THE POINT OF BEGINNING; THENCE
CONTINUE ALONG S 89°25' W, A DISTANCE OF 223.00 FEET,
THENCE N 00°35'W, A DISTANCE OF 605.80 FEET TO A POINT IN
AN OLD FENCE LINE, THENCE N 89°18'21" E, ALONG SAID OLD
FENCE LINE A DISTANCE OF 223.00 FEET, THENCE S 00°35' E,
DISTANCE OF 606.23 FEET TO THE POINT OF BEGINNING.

SUBJECT TO ALL RESTRICTIONS, RESERVATIONS, RIGHTS,
EASEMENTS, RIGHTS-OF-WAY, PROVISIONS, COVENANTS AND
BUILDING SET-BACK LINES OF RECORD.

ADDRESS: ██████ CATHERINE CREEK DRIVE; MOBILE, AL 36606.

State of Alabama - Mobile County
I certify this instrument was filed on:

Tue. Mar-09-2004 @ 9:10:09AM
RECORDING FEE        23.50
                      3.00
S. T. FEE
TOTAL AMOUNT        133.50

2004016721
Don Davis, Judge of Probate

CITIMORTGAGE/SOUTULLO000009

When recorded mail to:
ABN AMRO MORTGAGE GROUP, INC.
P.O. BOX 5064
TROY, MICHIGAN 48084
ATTN:FINAL/TRAILING DOCUMENTS

2002094537  Book-5269  Page-2145
Total Number of Pages: 9
---  --



DEFENDANT'S EXHIBIT

3  T. Soutullo

This instrument was prepared by:

Cliff Meggison
Interfirst, a Division of ABN Amro MOrtgage Group, Inc.
777 E. Eisenhower, Suite 700
Ann Arbor, MI 48108

LOAN #:

———————— [Space Above This Line For Recording Data] ————————

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated **NOVEMBER 21, 2002,**  together with all Riders to this document.

(B) "Borrower" is  **DONALD W SOUTULLO, A MARRIED MAN.** Joined by his wife, Tammy Soutullo

Borrower is the mortgagor under this Security Instrument.

(C) "Lender" is  **ABN AMRO MORTGAGE GROUP, INC.**

Lender is a  **CORPORATION**  organized and existing under the laws of **DELAWARE.**  Lender's address is  **2600 W. BIG BEAVER RD., TROY, MICHIGAN 48084.**

Lender is the mortgagee under this Security Instrument.

(D) "Note" means the promissory note signed by Borrower and dated  **NOVEMBER 21, 2002.**  The Note states that Borrower owes  **\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*FIFTY FOUR THOUSAND FOUR HUNDRED AND NO/100 \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*** Dollars (U.S.  **$54,400.00** ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **DECEMBER 1, 2017.**

(E) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider ☐ Condominium Rider ☐ Second Home Rider
☐ Balloon Rider ☐ Planned Unit Development Rider ☐ Other(s) [specify]
☐ 1-4 Family Rider ☐ Biweekly Payment Rider

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(K) "Escrow Items" means those items that are described in Section 3.

(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii)

ALABAMA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3001 1/01
Page 1 of 8

Initials:

ALUDEED 0008

A   Part 1   Page 61 of 61